# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SHANI MADDEN,

       Plaintiff,

vs.                                         No. CIV 19-0865 JB\SCY

KEN ORTIZ, in his official capacity as
Secretary of the New Mexico General
Services Department, and RAUL TORREZ,
in his Official Capacity as Second Judicial
District Attorney,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion for Preliminary Injunction, filed in State court August 27, 2019, filed in Federal Court September 19, 2019 (Doc. 3-1)("Motion").[1] The Court held an evidentiary hearing on February 5, 2020. Plaintiff Shani Madden seeks a preliminary injunction prohibiting the New Mexico General Services Department ("General Services") and the New Mexico Second Judicial District Attorney's Office from enforcing N.M. Stat. § 15-7-9(C), which provides that "[a]ny person who reveals" "records pertaining to claims for damages or other relief against any governmental entity" is "guilty of a misdemeanor." N.M. Stat. Ann. § 15-7-9(A)(2), (C). The primary issue is whether Madden has standing to pursue this action. Specifically, the Court must decide whether Madden has alleged a realistic threat of prosecution. The Court concludes that Madden has not alleged a realistic threat of prosecution,

---

[1] Plaintiff Shani Madden initially filed the Motion and the underlying complaint in State court. See Complaint at 1, filed September 18, 2019 (Doc. 1-1). The State court "had not heard or ruled on the Motion." Motion ¶ 4, at 1. Briefing on the Motion was complete on October 14, 2019. See Notice of Completion of Briefing, filed October 14, 2019 (Doc. 10).

because: (i) she does not propose engaging in activity which the statute prohibits; (ii) the Second Judicial District Attorney's Office has committed itself to a policy of non-prosecution; and (iii) the Second Judicial District Attorney's Office has never prosecuted § 15-7-9(C) violations. Accordingly, the Court dismisses this case without prejudice.

## **FINDINGS OF FACT**

The Court takes its facts from the Complaint, filed in State Court Aug. 20, 2019, filed in Federal Court September 18, 2019 (Doc. 1-1), the briefs on the Motion, and the evidence introduced at the hearing.

1.      Madden is a private citizen and resident of the State of New Mexico.  See Motion ¶ 1, at 1.

2.      The New Mexico Risk Management Division ("Risk Management") conserves the State of New Mexico's resources by procuring and administering the State's public liability fund, see N.M. Stat. Ann. § 41-4-23, workers' compensation reserve fund, see N.M. Stat. Ann. § 15-7-6, and the public property reserve fund, see N.M. Stat. Ann. § 13-5-1.  Risk Management also administers the State's group benefits self-insurance plan, which provides life, vision, health, dental, and disability coverage for state and local employees.  See N.M. Stat. Ann. § 10-7B-1.

3.      Risk Management maintains "'records pertaining to claims for damages or other relief against any governmental entity or public officer or employee.'"  Motion ¶ 2, at 1 (quoting N.M. Stat. Ann. § 15-7-9).

4.      Risk Management is organized within General Services.  See Motion ¶ 4, at 2.

5.      Ortiz is the Secretary of General Services.  See Motion ¶ 4, at 2.  Raúl Torrez is the District Attorney for the Second Judicial District, State of New Mexico.  See Complaint at 1.

6.      On July 5, 2019, the Albuquerque Journal published an opinion article that Ortiz wrote, in which he says that the "General Services Department . . . will not exploit possible loopholes in the 180-day rule and agree to longer confidentiality periods that negotiate away the public's right to know." NM agency shines light on settlements at 1, filed September 19, 2019 (Doc. 3-1)("Ortiz Op-Ed").

7.      Ortiz also asserts that "state law prohibits public disclosure of risk settlements until 180 days after the latest of four possible dates. One of those dates is when a lawsuit is brought to final judgment; another is when a case is fully settled." Ortiz Op-Ed at 1.

8.      Madden litigated a divorce in New Mexico state court which resulted in a trial in November, 2017. See Draft Hearing Transcript[2] at 4:1-10 (held February 5, 2020)(Stalter, Madden)("Tr.").

9.      After trial, Madden submitted a records request to the General Services for information about the divorce proceeding's opposing counsel and presiding judge, because she suspected a conflict of interest. See Tr. at 5:10-20 (Stalter, Madden).

10.     Madden "sought records related to the work of private law firms contracted with [Risk Management] . . . to investigate an undisclosed conflict of interest in her divorce case[.]" Complaint ¶ 11, at 3.

11.     After General Services did not respond to her records request, Madden filed suit in New Mexico State court against General Services alleging a violation of the New Mexico

---

[2]The Court citation to the hearing transcript refers to the unedited draft transcript. Accordingly, page and line numbers are subject to slight change in the final transcript.

Inspection of Public Records Act, N.M. Stat. Ann. §14-2-1 ("IPRA"). <u>See</u> Tr. at 5:21-6:1 (Stalter, Madden).

12.     Madden and General Services entered into a settlement agreement in which Madden released her IPRA claims against General Services, thus resolving the IPRA suit, on August 15, 2019. <u>See</u> Tr. at 6:9-10 (Stalter, Madden); <u>id.</u> at 6:21-22 (Stalter, Madden).

13.     Madden's settlement agreement does not contain a confidentiality provision. <u>See</u> Complaint ¶ 15, at 3.

14.     Madden and General Services stipulated to the IPRA lawsuit's dismissal, and the New Mexico state court issued an Order of Dismissal on September 4, 2019. <u>See</u> Stipulated Order of Dismissal in <u>Madden v. N.M. Gen. Servs. Dep't</u>, No. D-101-CV-2019-01185, County of Bernalillo, Second Judicial District, New Mexico (Plaintiff's Hearing Exhibit 3).

15.     When Madden and General Services entered into the settlement agreement, Madden was aware of the New Mexico statute, N.M. Stat. Ann. § 15-7-9(C), which prohibits her from publishing records pertaining to the settlement's details for 180 days. <u>See</u> Tr. at 11:8-18 (Park, Madden).

16.     N.M. Stat. Ann. 15-7-9(C) provides:

"Any person who reveals records protected pursuant to Subsection A of this section to another person in violation of this section is guilty of a misdemeanor and shall, upon conviction, be fined not more than one thousand dollars ($1,000). The State shall not employ any person so convicted for a period of five years after the date of conviction."

Complaint ¶ 2, at 1-2 (quoting N.M. Stat. Ann. 15-7-9(C)).

17.     General Services may refer violations of § 15-7-9(C) to local district attorneys' offices for prosecution. <u>See</u> Tr. at 17:5-7 (Pardo).

- 4 -

18.     In August, 2019, Madden solicited Risk Management's interpretation of § 15-7-9. See Email from Douglas E. Gardner to Sean FitzPatrick at 1 (dated Aug. 12, 2019)("Gardner Email"), filed Sept. 19, 2019 (Doc. 3-1).

19.     Risk Management responded that

"15-7-9(C) applies to 'Any person who reveals records.'  This would include Plaintiff, so far as the settlement amount and the release itself, it automatically applies and does not require Plaintiff to "agree" to it, rather, they contend that they are informing Plaintiff of the consequences should she violate State statute.  We can modify the language to reflect this, but we need a record that Plaintiff was informed."

Motion ¶ 5, at 4 (quoting Gardner Email at 1).

20.     Madden "wishes to discuss her claim and its outcome with friends and family and to publicize it on social media."  Motion ¶ 1, at 1.

21.     Madden believes that her IPRA litigation and the records she sought are "part of the bigger picture," and she "want[s] to tell [her] story[ to] expose wrongdoing."  Tr. at 8:18-22 (Madden).

22.     On August 20, 2019, KRQE, an Albuquerque, New Mexico, news broadcaster, interviewed Madden about her "divorce, . . . discovery of a potential conflict of interest, having to sue for records, and not being allowed to discuss settlement."  Tr. at 9:12-20 (Stalter, Madden).

23.     In the interview, Madden disclosed that she had settled with General Services, but did not share "the release or any details of the settlement."  Tr. at 9:21-10:1 (Stalter, Madden).

24.     Following the interview, neither General Services nor Risk Management "ever contacted [Madden] . . . regarding [her] case."  Tr. at 10:2-5 (Stalter, Madden).

25.     Madden has never been "threatened with prosecution regarding the statute."  Tr. at 11:22-24 (Park, Madden).

26.     The Second Judicial District Attorney's Office maintains records of all prosecutions since 1983.  <u>See</u> Tr. at 15:1-4 (Park, Madden).

27.     The Second Judicial District's records database does not, however, record whether an outside agency refers a case which the Second Judicial District Attorney's Office declines to prosecute.  <u>See</u> Tr. at 16:10-17 (Stalter, Pardo)(stating that a case is referred by an outside entity). The Second Judicial District Attorney's Office has no records that it has prosecuted any violations of § 15-7-9(C) since 1983.  <u>See</u> Tr. at 15:10-14 (Park, Pardo).

28.     Pardo announced at the evidentiary hearing, for the first time, that the Second Judicial District Attorney's Office has decided recently not to prosecute any violations of § 15-7-9(C).  <u>See</u> Tr. at 18:9-10 (Stalter, Pardo).

29.     Although Pardo does not generally hold authority to issue prosecution policies for the Second Judicial District Attorney's Office, the Second Judicial District Attorney -- Torrez -- authorized him to issue such a policy regarding § 15-7-9(C).  <u>See</u> Tr. at 20:10-23 (Stalter, Pardo).

## **PROCEDURAL BACKGROUND**

Before Ortiz and Torrez removed this action to federal court, Madden filed the Motion in State court on August 27, 2019.  <u>See</u> Motion at 1.  The State court "had not heard or ruled on the" Motion.  Motion ¶ 4, at 1.  After Ortiz and Torrez removed this case, Madden filed a Notice of Pending Motion alerting the Court to Madden's Motion.  <u>See</u> Notice of Pending Motion, filed September 19, 2019 (Doc. 3).

### 1.     **The Motion**.

Madden seeks a preliminary injunction "prohibiting Defendants from enforcing [N.M. Stat. Ann. §] 15-7-9(C)."  Motion at 1.  Madden asserts that § 15-7-9 prohibits private citizens from

revealing "'to another person'" details about lawsuit settlements with State government entities within 180 days of settlement. Motion ¶ 3, at 2 (quoting N.M. Stat. Ann. 15-7-9(C)). Madden argues that Risk Management has stated that § 15-7-9 applies to all settlement agreements between private citizens and State government entities, regardless whether the parties bargain for confidentiality. See Motion ¶¶ 2-3, at 1-2.

Madden notes the four requirements for a preliminary injunction's issuance: "(1) the plaintiff will suffer irreparable injury unless the injunction is granted; (2) the threatened injury outweighs any damage the injunction might cause the defendant; (3) issuance of the injunction will not be adverse to the public's interest; and (4) there is a substantial likelihood plaintiff will prevail on the merits." Motion at 3 (quoting Labalbo v. Hymes, 1993-NMCA-010, ¶ 11, 850 P.2d 1017, 1021). Madden first argues that she is substantially likely to prevail on the merits. See Motion at 3. Madden relies primarily on Landmark Communications v. Virginia, 435 U.S. 829 (1978), to argue that the First Amendment protects private citizens' right to publicize their interactions with government. See Motion at 3. Madden asserts that, in that case, the Supreme Court of the United States of America concluded that Virginia's stated interests in "preventing 'injury to official reputation' and 'administration of justice' were insufficient to justify restrictions on free speech." Motion at 3 (quoting Landmark Commc'ns. v. Va., 435 U.S. at 843, 845).

Madden argues that, since Landmark Communications v. Virginia, "courts have applied its principles and found similar confidentiality rules violate the First Amendment in a variety of contexts." Motion at 3 (citing Stilp v. Contino, 613 F.3d 405, 406 (3d Cir. 2010); Lind v. Grimmer, 30 F.3d 1115, 1117 (9th Cir. 1994); Doe v. Supreme Court of Fla., 734 F. Supp. 981, 988 (S.D. Fla. 1990)(Marcus, J.); Providence J. Co. v. Newton, 723 F. Supp. 846, 847 (D.R.I. 1989)(Pettine,

J.)).  Madden also cites state caselaw to support her contention that the First Amendment prohibits government from imposing confidentiality requirements on government affairs.  See Motion at 4 (citing In re Warner, 21 So. 3d 218, 223 (La. 2009)(attorney disciplinary proceedings); R.M. v. Supreme Court of N.J., 185 N.J. 208, 211, 883 A.2d 369 (2005)(attorney disciplinary proceedings); In re Brooks, 140 N.H. 813, 823, 678 A.2d 140 (1996)).  Madden acknowledges that Landmark Communications v. Virginia "involved a speech by a non-participant to the process," but asserts that "subsequent cases have ruled that its principles extend to those who file claims or complaints and wish to speak about them."  Motion at 4 (citing Stilp v. Contino, 613 F.3d at 406).

Turning to § 15-7-9(C), Madden argues that the New Mexico statute "cannot be distinguished from these precedents."  Motion at 4.  Madden contends that § 15-7-9(C) discriminates based on speech's content and so is subject to strict-scrutiny review.  See Motion at 4.  Madden avers that "[t]he statute cannot survive this scrutiny."  Motion at 4.  First, Madden asserts that § 15-7-9(C) is not narrowly tailored, because it restricts "'any person,' including private claimants, from disclosing records" that Risk Management creates or maintains, "regardless of the nature or subject matter of the claim, the public officials involved, the type of relief sought, the outcome of the claim, or whether the claimant has agreed to confidentiality as part of any settlement."  Motion at 4 (quoting N.M. Stat. Ann. § 15-7-9(C)).  Madden argues that the statute's prohibition "applies regardless of the time, place, or manner of the speech," and "encompasses everyone from a watchdog organization claiming records violations to an inmate seeking redress for sexual assault by a state corrections officer."  Motion at 4-5.  Second, Madden asserts that the statute does not serve any compelling government interest.  See Motion at 5.  Madden characterizes New Mexico's stated rationales as "[n]ebulous concerns about reputation

and orderly administration of claims," which Madden contends are "insufficient to restrict speech at the core of the First Amendment." Motion at 5 (citing Landmark Commc'ns v. Virginia, 435 U.S. at 839-45).

Turning to her request for injunctive relief, Madden argues that she will suffer irreparable injury unless the Court issues the injunction. See Motion at 5. Madden asserts that unconstitutional speech restrictions, however brief, amount to irreparable harm. See Motion at 5 (citing Elrod v. Burns, 427 U.S. 347, 373 (1976)). Madden quotes a United States Court of Appeals for the Tenth Circuit case to argue that "'most courts hold that no further showing of irreparable injury is necessary'" once a plaintiff proves a constitutional violation. Motion at 5 (quoting Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir. 2001), and citing 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)). Her injury is also irreparable, Madden contends, because "monetary relief following trial will not properly redress the constitutional violations." Motion at 6. Madden contends that equitable relief is proper when legal remedies, such as money damages, are not enough to make the plaintiff whole. See Motion at 6 (citing Planned Parenthood Ass'n of Utah v. Herbert, 828 F.3d 1245, 1263 (10th Cir. 2016)). Madden argues that, because § 15-7-9(C)'s "specter of prosecution" chills her speech, "she has suffered and will continue to suffer an irreparable injury unless and until this Court issues a preliminary injunction." Motion at 6 (citing Elrod v. Burns, 427 U.S. at 373; Planned Parenthood Ass'n of Utah v. Herbert, 828 F.3d at 1263).

Madden next argues that her "loss of constitutional rights" in the injunction's absence outweighs "any possible damage to the Defendants" that the injunction might cause. Motion at 6. Madden argues that, "'[w]hen a constitutional right hangs in the balance . . . even a temporary loss

- 9 -

usually trumps any harm to the defendant.'" Motion at 6 (quoting <u>Free the Nipple-Fort Collins v. City of Fort Collins</u>, 916 F.3d 792, 806 (10th Cir. 2019)). Madden notes that Ortiz "has publicly committed to publishing settlement agreements online after the 180-day period." Motion at 6. Madden asserts that, if Ortiz' publishing a settlement agreement after 180 days does not harm New Mexico, an injunction which permits Madden to publish her settlement agreement before 180 days will not harm New Mexico. Motion at 6. Similarly, Madden asserts that enjoining § 15-7-9(C)'s enforcement will serve the public interest, because the "public has a strong interest in the vindication of constitutional rights." Motion at 7 (citing <u>Phelps-Roper v. Nixon</u>, 509 F.3d 480, 485 (8th Cir. 2007)). "Further," Madden contends, "Section 15-7-9(C) seems calculated to protect government officials rather than the general public." Motion at 7. Madden avers that the "Defendants must concede[ that] the public has a strong interest in transparency of government affairs." Motion at 7.

Finally, Madden requests that the Court "waive furnishing of security under Rule 1-066 NMRA." Motion at 7.[3] Madden contends that the Court has good cause to waive the security

-----------------------

[3]Rule 1-066(C) of the New Mexico Rules Annotated provides:

No restraining order[ or preliminary injunction] shall issue or occur . . . except upon the giving or security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

N.M. R. Ann. 1-066(C). Rule 1-066 finds its analog in rule 65(c) of the Federal Rules of Civil Procedure. The Court will address rule 65's applicability in this Opinion's Analysis section. As Madden initially filed the Motion in State court, the Court will construe Madden's rule 1-066's arguments as rule 65 arguments.

requirement, because "this case presents a purely legal issue," and because "Madden has a substantial likelihood of success on the merits." Motion at 7. Madden accordingly argues that both the cost and likelihood of wrongful injunction are low. See Motion at 7. Madden concludes by requesting that the Court issue a preliminary injunction prohibiting § 15-7-9(C)'s enforcement without requiring Madden to furnish a security. See Motion at 7-8.

2. **The Torrez Response**.

Torrez filed a response in State court before the Defendants removed the case. See Defendant Second Judicial District Attorney's Response to Plaintiff's Motion for Preliminary Injunction at 1, filed in State Court on September 11, 2019, filed in Federal Court on September 19, 2019 (Doc. 3-2)("Torrez Response"). Torrez asserts that his "role in this litigation is peripheral in that any criminal referral must originate from a different government entity." Torrez Response at 1. Torrez accordingly asserts that the Second Judicial District Attorney's Office "does not oppose a preliminary injunction during the pendency of this litigation." Torrez Response at 1.

3. **The Ortiz Response.**

Ortiz responds. See Defendant Ken Ortiz's Response to Motion for Preliminary Injunction at 1, filed October 1, 2019 (Doc. 8)("Ortiz Response"). Ortiz begins by quoting at length an opinion from the Supreme Court:

> "A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."

Ortiz Response at 1-2 (quoting Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24 (2008)("Winter")(citations omitted in Ortiz Response). Ortiz contends that an injunction "should

not be granted," if any of the four factors that courts employ to decide a request for injunctive relief weigh against a preliminary injunction. Ortiz Response at 2. Ortiz also asserts that courts disfavor mandatory preliminary injunctions, which direct "'the nonmoving party to take affirmative action,'" and so courts require a "'heightened showing'" of the four preliminary injunction factors. Ortiz Response at 2 (quoting Little v. Jones, 607 F.3d 1245 (10th Cir. 2010)). Ortiz contends that Madden's requested injunction is a mandatory preliminary injunction, because Madden "essentially requests that Secretary Ortiz affirmatively order the officials and employees of the General Services Division not to refer violations of N.M.S.A. § 15-7-9(C) to the appropriate prosecutors." Ortiz Response at 2. Ortiz also asserts that, because Madden sues him in his official capacity and not the General Services Department directly, Madden's requested injunction amounts to a mandatory preliminary injunction. See Ortiz Response at 2. Ortiz accordingly asserts that the Court should review the Motion "under the heightened standard." Ortiz Response at 2. Ortiz argues that "the weight of each of the four factors is, at best, equivocal regarding the propriety of a preliminary injunction" and requests that the Court deny the Motion. Ortiz Response at 2.

Ortiz asserts that Madden is unlikely to prevail on the merits. See Response at 2-3. Section 15-7-9(C), Ortiz avers, "helps to protect the state from frivolous lawsuits by keeping settlements confidential for the first 180 days, on the theory that the 'copycat' effect would be lessened over time." Ortiz Response at 3. Ortiz contends that, "by reducing this concern, the ban on revealing settlements is narrowly tailored to serve the compelling state interest of encouraging settlements and preventing frivolous lawsuits," and so "is constitutional." Ortiz Response at 3 (citing Kamasinski v. Judicial Review Council, 44 F.3d 106, 111 (2d Cir. 1994)). Ortiz then argues that Landmark Communications v. Virginia is inapposite, because that case, "like Kamasinki, [sic]

concerned confidentiality provisions regarding judicial investigation." Ortiz Response at 3. Ortiz argues that the "Supreme Court made a point to limit the holding," and asserts that Landmark Communications v. Virginia addresses only "'whether the First Amendment permits the criminal punishment of third persons who are strangers to the inquiry, including the news media, for divulging or publishing truthful information regarding confidential proceedings of the Judicial Inquiry and Review Commission.'" Ortiz Response at 3 (quoting Landmark Commc'ns v. Virginia, 435 U.S. at 837). Ortiz distinguishes this case, because "Madden is not a stranger to the proceedings, as she was a party to the underlying litigation." Ortiz Response at 3. Ortiz acknowledges that, while Madden cites "cases that indicate that it may be impermissible to punish a party for violating confidentiality rules, none of them are binding precedent on this Court, as they are all from state courts, federal district courts, or circuit courts other than the Tenth." Ortiz Response at 3-4. Ortiz also argues that Kamasinski v. Judicial Review Council "clearly shows [that] there is substantial disagreement on the issue" and asserts that Madden's cited cases do not pertain to requirements that "a party to ordinary litigation keep the details of a settlement confidential." Ortiz Response at 4. "Quite simply," Ortiz avers, "all that Plaintiff can say is that there is a possibility that she will prevail on the merits." Ortiz Response at 4. Ortiz contends that this possibility is insufficient to meet the "heightened showing" which Ortiz argues applies to the Motion. Ortiz Response at 4.

Ortiz next argues that, even if § 15-7-9(C) is unconstitutional, Madden waived her ability to pursue her claim. See Ortiz Response at 4. Ortiz also argues that, "to the extent that Plaintiff had a constitutional right to reveal . . . her settlement within the first 180 days, she contracted away that right," because "her attorneys were aware of the statute in question prior to the settlement."

Ortiz Response at 4. Ortiz contends that the First Amendment "'does not confer . . . a constitutional right to disregard promises that would otherwise be enforced under state law.'" Ortiz Response at 4 (quoting <u>Cohen v. Cowles Media Co.</u>, 501 U.S. 663, 672 (1991)(alteration in Ortiz Response)). Ortiz notes that Madden says that her settlement agreement with the State of New Mexico "does not contain any confidentiality provision," but contends that Madden settled that case after Ortiz's opinion column in the Albuquerque Journal. Ortiz Response at 4. Ortiz also asserts that Risk Management informed Madden's counsel of the confidentiality statute before Madden settled her case. <u>See</u> Ortiz Response at 12. Ortiz accordingly argues that Madden knew that her settlement would be subject to § 15-7-9(C), and so Madden "waiv[es] any claim that confidentiality provision was unconstitutional." Ortiz Response at 5. Ortiz accordingly asserts that Madden is unlikely to prevail on the merits. <u>See</u> Ortiz Response at 5.

Ortiz next argues that Madden is unlikely to suffer irreparable injury if the Court does not issue the preliminary injunction. <u>See</u> Ortiz Response at 5. Ortiz notes Madden's assertion that constitutional violations amount to irreparable harm, but Ortiz contends that § 15-7-9(C) is constitutional and so Madden will suffer no harm in an injunction's absence. <u>See</u> Ortiz Response at 5. Ortiz also characterizes the Torrez Response as committing the Second Judicial District Attorney's Office to forego all prosecutions of § 15-7-9(C) violations and accordingly argues that Madden will not be prosecuted if she publishes her settlement's details. <u>See</u> Ortiz Response at 5.

Ortiz then argues that "the balancing of the equities favors Ortiz." Ortiz Response at 5 (capitalization altered). Ortiz contends that "[i]t is likely that the confidentiality statute factored into the decisions by both Plaintiff and the General Services Department to enter into the earlier settlement agreement." Ortiz Response at 6. Ortiz alleges that Madden is "attempting to eliminate,

- 14 -

after the fact, part of the basis for the settlement agreement." Ortiz Response at 6. "Plaintiff's actions thus render her the inequitable party," Ortiz contends. Ortiz Response at 6.

Finally, Ortiz says that Madden's requested preliminary injunction would not serve the public interest. See Ortiz Response at 6. Ortiz argues that "the State of New Mexico entered into many settlement agreements under the reasonable belief that these agreements would be kept confidential for 180 days." Ortiz Response at 6. Madden's requested preliminary injunction, Ortiz contends, "will be a great detriment to the State, which had to pay . . . to settle these suits, but does not derive the benefit of confidentiality." Ortiz Response at 6. Ortiz argues, therefore, that an injunction "will be a substantial loss to the State of New Mexico and, by extension, the public." Ortiz Response at 6. "Accordingly," Ortiz asserts, "even though it may be in the public interest to protect constitutional rights, it is also in the public interest to protect the state from frivolous lawsuits and other harms that the temporary confidentiality provisions prevent." Ortiz Response at 6 (citing Turner v. Mem'l Med. Ctr., 911 N.E.2d 369, 378 (Ill. 2009)). Ortiz does not address Madden's request that the Court waive the security requirement, but asks that the Court deny the Motion. See Ortiz Response at 6.

### 4. **The Reply.**

Madden replies. See Reply in Support of Motion for Preliminary Injunction at 1, filed October 14, 2019 (Doc. 9)("Reply"). Madden begins by asserting that she seeks a prohibitory injunction, not a mandatory one, and so the Motion "is not subject to the heightened showing required of mandatory injunctions." Reply at 1. Madden says that the injunction which she seeks would "prohibit[] Defendants from enforcing NMSA 1978, Section 15-7-9(C) (1981) during the pendency of this case." Reply at 1. Such an injunction, Madden argues, is defined properly as

prohibitive.  See Reply at 1 (citing Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 269 F.3d 1149, 1155 (10th Cir. 2001)).  Madden contends that Ortiz' argument contradicts the Motion's "plain text."  Reply at 1.  Madden asserts that Ortiz "cites no authority for the idea that an otherwise prohibitory injunction becomes mandatory solely because an agency head will instruct subordinates to comply with the prohibition."  Reply at 2.  Ortiz' argument, Madden asserts, "suggests that every injunction sought against an organization or its officers would be a mandatory injunction," because all injunctions against organizations entail some expectation that the organizations' directors must order the organizations' agents to comply.  Reply at 2.

Madden cites a previous instance in which the Court "granted preliminary injunctions against agency heads without requiring a heightened showing that the injunction was prohibitory in nature."  Reply at 2 (citing Navajo Health Found. v. Burwell, 100 F. Supp. 3d. 1122 (D.N.M. 2015)(Browning, J.)).  Madden asserts that, in that case, "[t]he determining factor was not whether any official would be required to act affirmatively but [rather] the 'negligible chance that the Court will find itself having to perpetually supervise the preliminary injunction.'"  Reply at 2 (quoting Navajo Health Found. v. Burwell, 100 F. Supp. 3d at 1170).  Madden argues that, when compliance is "'readily ascertainable,'" an injunction places minimal burdens on the issuing court, and so such an injunction is not disfavored.  Reply at 2 (quoting Navajo Health Found. v. Burwell, 100 F. Supp. 3d at 1170).  Madden avers that her requested injunction "will not place a heavy burden on the court and is therefore not disfavored."  Reply at 2.  Madden says that "Ortiz suggests that his argument might differ if his department was the Defendant," but Madden asserts that Ex Parte Young, 209 U.S. 123 (1908), precludes such a suit.  Reply at 2.

Madden next reasserts her argument that she is likely to succeed on the merits. See Reply at 3. Madden argues that Ortiz' stated rationales -- that § 15-7-9(C) protects the State from frivolous copycat lawsuits -- "fail[] for several reasons." Reply at 2. Madden asserts, first, that Ortiz "offers no authority that concern over 'copycat' frivolous lawsuits is sufficiently compelling to override the First Amendment right to discuss government conduct." Reply at 3. Madden argues, second, that § 15-7-9(C) is not narrowly tailored, because it provides that the 180-day confidentiality period applies regardless whether a case settles, and bans "disclosure of all claims, even meritorious ones." Reply at 3. Madden contends that meritorious claims are unlikely to inspire similar, but frivolous, claims. See Reply at 3. Madden also notes that "frivolous lawsuits are independently punishable by the tort of malicious abuse of process." N.M. R. Ann. 1-011. Reply at 3 (citing Durham v. Guest, 2009-NMSC-007, 204 P.3d 19). Madden accordingly argues that Ortiz' stated government interest is "'too negligible and remote to justify'" § 15-7-9(C)'s "'blanket prohibition.'" Reply at 3 (quoting Stilp v. Contino, 613 F.3d at 415). Madden argues, third, that "the sole case on which the Secretary relies, *Kamasinki v. Judicial Review Council* [sic], . . . supports Plaintiff's position." Reply at 4. Madden contends that the statute at issue in that case "was far narrower than Section 15-7-9 . . . and the state interests identified were closely linked to" to the records whose disclosure the statute prohibited. Reply at 4 (citing Kamasinski v. Judicial Review Council, 44 F.3d at 109-10). Madden argues that the United States Court of Appeals for the Second Circuit, in Kamasinski v. Judicial Review Council, "made clear that the Court would have no trouble rejecting" a statute like § 15-7-9(C). Reply at 4.

Madden next disputes Ortiz' argument that she waived her challenge to § 15-7-9(C). See Reply at 4. Madden argues that her settlement agreement with General Services does not include

a contractual confidentiality provision and that the parties could have bargained one if either side desired.  See Reply at 4.  Madden also avers that § 15-7-9(C) "applies regardless whether the case settles" and argues that, "[b]ecause the settlement did not alter the statute's purported application, it is difficult to see how the statute was implicitly incorporated into the contract."  Reply at 5.  Madden asserts, further, that "[t]here was no consideration offered or given for an alleged waiver of constitutional rights."  Reply at 5 (citing Heye v. Am. Golf Corp., 2003-NMCA-138, ⁋ 12, 80 P.3d 495).  Even if the settlement agreement amounts to a waiver, Madden argues, unconstitutional laws are void ab initio, and so § 15-7-9(C), if unconstitutional, cannot impose duties upon Madden. See Reply at 5.  "Finally," Madden argues that Ortiz' cited case on this point is inapplicable.  Reply at 5.  Madden contends that in Cohen v. Cowles Media Co., the parties agreed upon confidentiality, and that this agreement was central to the Supreme Court's holding.  See Reply at 5-6 (citing Cohen v. Cowles Media Co., 501 U.S. at 665, 671).  Madden also asserts that, "in Cohen, the state doctrine of promissory estoppel was a law of general applicability," while "§ 15-7-9 is not generally applicable," because it "applies to a particular class of people (individuals with claims against the state) and restricts their speech based on its content (records created or maintained by the State Risk Management Division)."  Reply at 6 (citing Cohen v. Cowles Media Co, 501 U.S. at 670).

Madden next returns to her argument that she will suffer irreparable harm in the injunction's absence.  See Reply at 6.  While Ortiz disputes § 15-7-9(C)'s constitutionality, Madden says that Ortiz concedes that "Madden has at least alleged a constitutional violation." Reply at 6 (citing Notice of Removal, filed September 18, 2019 (Doc. 1))(emphasis in Reply). Madden contends that injunctive relief is proper when a plaintiff alleges a continuing constitutional

violation.  <u>See</u> Reply at 6 (citing <u>Fish v. Kobach</u>, 840 F.3d 710 (10th Cir. 2016)).  Madden also argues that the Torrez Response does not mitigate the risk of prosecution, because Torrez says only that another government entity must originate a criminal referral for prosecution to commence, and Madden opines that, if General Services made such a referral, the Second Judicial District Attorney's office would "[p]resumably" prosecute Madden.  Reply at 7 (citing Torrez Response at 1).  Madden further contends that the statute's existence chills her speech and that of those, like her, who have litigated against New Mexico State government entities within the past 180 days.  <u>See</u> Reply at 7 (citing <u>Wilson v. Stocker</u>, 819 F.3d 943, 946 (10th Cir. 1987)).  Madden asserts that her "injury continues so long as the Defendants are not enjoined from enforcing Section 15-7-9(C)."  Reply at 7.

Turning to the preliminary injunction test's next prongs, Madden argues that "the balance of equities favors a preliminary injunction," because "'[w]hen a constitutional right hangs in the balance . . . even a temporary loss usually trumps any harm to the defendant.'"  Reply at 7 (quoting <u>Free the Nipple-Fort Collins v. City of Fort Collins</u>, 916 F.3d at 806).  Madden also asserts that a preliminary injunction would serve the public interest in ensuring that "'public officials do not engage in conduct that violate the constitutional rights of another citizen.'"  Reply at 8 (quoting <u>Planned Parenthood Ass'n v. Utah</u>, 828 F.3d at 1266, and citing <u>Awad v. Ziriax</u>, 670 F.3d 1111, 1132 (10th Cir. 2012)).  Madden says that, "[d]espite this precedent," Ortiz argues that New Mexico's "reliance on an unconstitutional statute is grounds to deny a preliminary injunction."  Reply at 8 (citing Ortiz Response at 6).  Madden notes that Ortiz' cited case, <u>Turner v. Memorial Medical Center</u>, recognizes a "general public interest in deterring lawsuits," but Madden asserts that First Amendment rights outweigh this interest.  Reply at 9 (citing <u>Turner v. Mem'l Med. Ctr.</u>,

233 Ill. 2d at 507). Finally, Madden argues that Ortiz' stated public interest is minimal, because § 15-7-9(C)'s "value in deterring frivolous lawsuits is entirely speculative." Reply at 9. Madden says that "Ortiz makes no showing that frivolous lawsuits against the State were especially problematic prior to enactment of this statute or that other sanctions are insufficient to deter frivolous lawsuits." Reply at 9. Madden, thus, argues that the balance of equities favors her requested preliminary injunction, which would not be against the public interest. See Reply at 8-9. Madden accordingly requests that the Court grant the preliminary injunction.

**5.** <u>**The Hearing**</u>.

The Court held a hearing on February 5, 2020. <u>See</u> Tr. at 1. Madden began the hearing by testifying as a fact witness. <u>See</u> Tr. at 3:5-6 (Stalter). Madden described the origins of her IPRA litigation against General Services. <u>See</u> Tr. at 4:1-7 (Stalter, Madden). Madden litigated a lengthy divorce proceeding which led to a four-day trial in November, 2017. <u>See</u> Tr. at 4:4-7 (Stalter, Madden). After the trial, Madden and her attorney believed that the State district judge treated her unfairly and suspected a conflict of interest or partiality towards Madden's opposing counsel. <u>See</u> Tr. at 4:11-25 (Stalter, Madden). Madden discovered that opposing counsel had previously represented the judge in separate litigation. <u>See</u> Tr. at 4:23-5:2 (Stalter, Madden). Madden said that, while she appealed the State district judge's ruling in the divorce matter, she also submitted an IPRA request for records relating to the State district judge's relationship with Madden's opposing counsel. <u>See</u> Tr. at 5:6-12 (Stalter, Madden). Madden said that General Services did not respond to the IPRA request, so she sued General Services in New Mexico State court on an IPRA cause of action. <u>See</u> Tr. at 5:22-6:5 (Stalter, Madden). Madden testified that she settled the IPRA suit with General Services on August 15, 2019. <u>See</u> Tr. at 6:10 (Madden). Madden said that,

before she signed the settlement agreement, her attorney "made [her] aware that there is a statute of nondisclosure for 180 days for any lawsuit with the state whether it settled or not." Tr. at 8:2-5 (Madden).

Madden said that, after settling, she "found it suspicious that we weren't getting the records regarding the judge and opposing counsel, and that it was just part of the bigger picture. And I wanted to tell my story, expose wrongdoing . . . ." Tr. at 8:18-22 (Madden). She testified that she wants to "[s]hare [her story] with anybody I wanted regarding what came after we had to sue for records." Tr. at 8:25-9:1 (Madden). Madden said that, on August 20, 2019, she sat for an interview with a local newspaper, in which she discussed her "divorce, . . . discovery of a potential conflict of interest, having to sue for records, and not being allowed to discuss settlement," although she disclosed the settlement's existence. Tr. at 9:12-23 (Stalter, Madden). Madden stated that Risk Management and General Services have not contacted her regarding her eligibility to discuss the settlement's details, and she does not know whether she is "allowed to talk about it or not." Tr. at 10:16-17 (Madden). See id. at 10:2-11 (Stalter, Madden). Madden said that, if not for § 15-7-9(C), she would share her story, which she "believes to be absurd." Tr. at 10:18-22 (Stalter, Madden). On cross-examination, Madden acknowledged that she was "fully aware" of § 15-7-9(C) when she signed the settlement agreement. Tr. at 11:12-14 (Marcus, Madden). Madden testified that she has never been "threatened with prosecution regarding the statute." Tr. at 11:22-24 (Marcus, Madden).

The Defendants called David Pardo to testify. See Tr. at 13:7-8 (Marcus). Pardo said that he is an assistant district attorney and records custodian for the Second Judicial District Attorney's Office. See Tr. at 13:22-23 (Pardo). Pardo said that the Second Judicial District Attorney's Office

maintains an electronic records database, which allows him to search prosecutions by statute. See Tr. at 14:12-19 (Marcus, Pardo). The database's records begin in 1983, Pardo testified. See Tr. at 15:1-2 (Marcus, Pardo). Pardo stated that he searched the database and found no records that the Second Judicial District Attorney's Office had prosecuted a § 15-7-9(C) violation. See Tr. at 15:12-14 (Pardo). Pardo said that this office has no "intention of prosecuting anybody under that statute" for a "number of reasons," including Madden's lawsuit and a suspicion that the New Mexico Legislature may amend § 15-7-9. Tr. at 15:17-23 (Pardo). On cross-examination, Pardo clarified that the database would not record instances where a separate government entity referred a matter for prosecution, but which the Second Judicial District Attorney's Office declined to prosecute. See Tr. at 16:13-17 (Stalter, Pardo). Pardo stated that his office has no way to independently learn of a violation, because district attorney's offices are typically unaware of any underlying settlement agreements about which prosecutors could establish whether a public statement amounts to a § 15-7-9(C) violation. See Tr. at 17:5-14 (Pardo). Pardo also stated that the Second Judicial District Attorney's Office will not prosecute § 15-7-9(C) violations "until the law is clarified." Tr. at 18:9-10 (Pardo). Pardo asserted that he is "vested with authority . . . to bind [his] superiors to that" commitment. Tr. at 18:15-17 (Stalter, Pardo). Pardo agreed, however, that "there has been no written official statement of policy." Tr. at 18:21-23 (Stalter, Pardo).

The parties then turned to their legal arguments. See Tr. at 21:20-24 (Court, Stalter). The Court asked Madden "the exact relief" that she wants, Tr. at 22:1 (Court,) and Madden responded that she requests "an order on a preliminary injunction prohibiting the defendants from enforcing section 15-7-9 against any private claimant, meaning someone who is not an employee of the State of New Mexico," Tr. at 22:2-7 (Stalter). Madden acknowledged that her requested injunction

exceeds this case's scope, because she asserts a facial challenge to § 15-7-9(C). <u>See</u> Tr. at 22:10-14 (Stalter). Turning to her case's merits, Madden contended that Supreme Court caselaw demonstrates that "the Government's interest in prohibiting a private claimant from talking about their own claims is just not sufficient to overcome the First Amendment." Tr. at 23:17-21 (Stalter). Madden also asserted that, under <u>Kamasinski v. Judicial Review Council</u>, states may properly "keep things confidential at a preliminary or probable cause stage," but he argued that § 15-7-9(C) amounts to a blanket confidentiality rule. Tr. at 25:1-8 (Stalter). Madden asserted that no government interest justifies § 15-7-9(C)'s prohibition. <u>See</u> Tr. At 25:6-9 (Stalter). The Court responded that, in federal court, several matters are kept confidential, such as government informants, juvenile proceedings, and trade secrets. <u>See</u> Tr. at 25:10-15 (Court). Madden responds that, for such matters, "there is typically a specific finding" for each case in which a court deems confidentiality justified, or a rule that automatically applies to specific records or to a specific case type. Tr. at 25:18-24 (Stalter). Madden argued that, in contrast, § 15-7-9(C) "has none of those [rationales] that pertain to criminal harms, national security or trade secrets," but rather applies to "every claim at any stage up until it's concluded and 180 days passed." Tr. at 26:1-6 (Stalter). Madden also asserted that, even without § 15-7-9(C), the State of New Mexico may further its stated interests by insisting on confidentiality provisions in its settlement agreements. <u>See</u> Tr. at 27:17-21 (Stalter). Madden next argued that the heightened standard for mandatory injunctions is inapplicable here, because she seeks a prohibitory injunction. <u>See</u> Tr. at 27:24-2 (Stalter). Madden also contended that Ortiz has the burden to prove that § 15-7-9(C) satisfies strict scrutiny. <u>See</u> Tr. at 28:4-5 (Stalter).

Ortiz then argued that § 15-7-9(C) is constitutional, and so Madden is unlikely to prevail on the merits. See Tr. at 28:19-22 (Marcus). Section 15-7-9(C), Ortiz asserted, "prohibits the divulging of . . . confidential information" for 180 days. Tr. at 28:22-24 (Marcus). Ortiz argued that the 180-day period is "narrowly tailored to serve a compelling state interest and that is the copy cat lawsuits and also to encourage settlements." Tr. at 28:25-29:3 (Marcus). Ortiz opined that "the state is going to be more willing to enter into these settlements if they are aware that there is this 180[-]day period where the settlements are not going to be divulged." Tr. at 29:3-6 (Marcus). Ortiz also contended that the statute is "viewpoint neutral," because its blanket confidentiality rule does not distinguish between whether a statement is "pro settlement or against it," and "has nothing to do with whether the statement is disparaging the state or nondisparaging . . . and it's not a prior restraint." Tr. at 29:7-12 (Marcus). Ortiz distinguished Landmark Communications v. Virginia by arguing that the case "concerned people who were strangers to the proceeding." Tr. at 29:21-24 (Marcus). Section 15-7-9(C), Ortiz argued, applies to those who "entered into a settlement agreement of her own free will knowing that she would be subjected to the statute." Tr. at 29:25-30:3 (Marcus).

Ortiz then argued that the Second Judicial District Attorney's commitment to abstain from prosecuting § 15-7-9 violations means that Madden will not suffer irreparable harm in an injunction's absence. See Tr. at 30:14-16 (Marcus). Ortiz also asserted that Madden seeks a mandatory injunction, "because no one is actually being prosecuted right now," and characterized Madden's request as "asking . . . the Second [Judicial District Attorney] to go around [and say] 'don't refer these cases, don't do that.'" Tr. at 30:18-21 (Marcus). Ortiz next asserted that equity favors denying the Motion, because General Services "entered into this settlement agreement

believing that the confidentiality provision would hold," such that an injunction "would undermine one of the fundamental background facts that supported the idea of this settlement agreement." Tr. at 31:21-32:2 (Marcus).

Madden responded that § 15-7-9(C) does not encourage settlements, "because it applies regardless of whether a settlement is entered or not," and regardless of a case's outcome or disposition. Tr. at 33:23-34:4 (Stalter). Although Madden asserted that bargained-for agreements between the State and private claimants serve adequately New Mexico's stated interest, Madden acknowledged that such agreements would not bind third parties or news media. See Tr. at 34:12-22 (Court, Stalter). Madden also asserted that the Motion is not moot, because "[n]obody seems to know when the claim has been placed on closed status," which will trigger the 180-day confidentiality period. Tr. at 35:25-36:1 (Stalter). Madden said that, if the IPRA case's dismissal triggers the confidentiality period, then a month still remains "in which she could have the benefit of her First Amendment rights." Tr. at 36:3-5 (Stalter). Madden continued that, after her confidentiality period expires, the Motion will still present a controversy, because the confidentiality requirement is "capable of repetition yet evading review, which means that it can be considered by the Court even if it otherwise might be considered moot." Tr. at 36:7-13 (Stalter).

6.     **The New Mexico Legislature Takes Up § 15-7-9(C).**

The Second Session of the 54th Legislature of the State of New Mexico began on January 21, 2020. See New Mexico Legislature, "Session Dates," www. nmlegis.gov (last accessed Feb. 19, 2020). Legislators proposed two bills that would amend § 15-7-9(C) to eliminate the statute's criminal penalties and 180-day confidentiality period. See, e.g., SB 64, PUBLIC RECORDS PERTAINING TO CERTAIN CLAIMS; SB 145, CHANGES TO PUBLIC RECORDS

REPORTING. SB 64 "remov[es] the one-hundred-eighty-day delay in releasing public records pertaining to against governmental entities," "chang[es] and remov[es] the events that trigger release of public records," and "eliminat[es] criminal penalties for revealing confidential records pertaining to certain claims against governmental entities[.]" SB 64 at 1:11-20 (capitalization altered). SB 64 makes records "pertaining to claims for damages or other relief against any governmental entity or public officer" subject to public inspection immediately after final judgment is issued or a "settlement agreement is signed by all of the parties." SB 64 at 2:8-3:4 (capitalization altered).

On February 8, 2020, the New Mexico Senate passed unanimously SB 64. See New Mexico Legislature, "2020 Regular Session - SB 64: Actions," https://www.nmlegis.gov/Legislation/Legislation?chamber=S&legType=B&legNo=64&year=20 (last accessed Feb. 19, 2020)("SB 64: Actions"). On February 17, 2020, the New Mexico House of Representatives unanimously passed SB 64. See SB 64 Actions. SB 64 is, accordingly, awaiting the Governor of New Mexico's signature. The Constitution of New Mexico provides that enacted legislation "shall go into effect ninety days after the adjournment of the legislature enacting them," unless the Legislature designates the law as "necessary for the preservation of the public peace, health or safety." N.M. Const. Art. IV § 23. SB 64 does not contain such an emergency clause and does not specify any effective date. The Second Session of the 54th Legislature of the State of New Mexico ended at noon on February 20, 2020. See Session Dates at 1. If the Governor of New Mexico approves SB 64 -- which appears likely -- the law will go into effect on May 20, 2020. Accordingly, § 15-7-9(C) will persist in its current form until at least May 20, 2020.

## LAW REGARDING STANDING

A federal court may hear cases only where the plaintiff has standing to sue. Standing has two components. First, standing has a constitutional component arising from Article III's requirement that federal courts hear only genuine cases or controversies. Second, standing has a prudential component. See Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1224 n.7 (10th Cir. 2008)(noting that prudential standing concerns may prevent judicial resolution of a case even where constitutional standing exists). The burden of establishing standing rests on the plaintiff. See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998). The plaintiff must "allege . . . facts essential to show jurisdiction. If they fail to make the necessary allegations, they have no standing." FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(internal citations and quotations omitted). Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "unless the contrary appears affirmatively from the record." Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986))(internal quotation marks omitted). "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record." Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231)(citations omitted)(internal quotation marks omitted).

### 1.     **Article III Standing.**

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies." San Juan Cty., Utah v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc). See U.S. Const. art. III, § 2. "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete

adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)(quoting Massachusetts v. EPA, 549 U.S. 497, 539 (2007))(internal quotation marks omitted). "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing." San Juan Cty., Utah v. United States, 503 F.3d at 1171. To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision." Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(internal quotation marks omitted).

"Standing is determined as of the time the action is brought." Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)). In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law. 484 F.3d at 1285. The Tenth Circuit noted that the plaintiff had recently taken his state appeal and, therefore,

> was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in <u>Nova Health Systems v. Gandy</u>, the Tenth Circuit found that abortion providers had standing to challenge an Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law. <u>See</u> 416 F.3d at 1154. Although finding standing, the Tenth Circuit was careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova Health faced any imminent likelihood that it would lose some minor patients seeking abortions. 416 F.3d at 1155. Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing. <u>See</u> 416 F.3d at 1155.

The mere presence on the books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct that the statute prohibits. <u>See</u> <u>Winsness v. Yocom</u>, 433 F.3d 727, 732 (10th Cir. 2006). "This does not necessarily mean that a statute must be enforced against the plaintiff before he can sue." <u>Winsness v. Yocom</u>, 433 F.3d at 732 (quoting <u>Ward v. Utah</u>, 321 F.3d 1263, 1267 (10th Cir. 2003)). Where a plaintiff can show a "credible threat of prosecution," they can sue for prospective relief against enforcement. <u>Winsness v. Yocom</u>, 433 F.3d at 732 (quoting <u>Ward v. Utah</u>, 321 F.3d at 1267). Thus, to satisfy Article III, the "plaintiff's expressive activities must be inhibited by an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement." <u>Winsness v. Yocom</u>, 433 F.3d at 732 (internal quotations omitted). <u>See</u> <u>Wilson v. Stocker</u>, 819 F.2d 943, 946 (10th Cir. 1987)(holding

that the plaintiff has standing where he suffers "an ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights").

## 2. **Prudential Standing**.

"Prudential standing is not jurisdictional in the same sense as Article III standing." Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007). Prudential standing consists of "a judicially-created set of principles that, like constitutional standing, places limits on the class of persons who may invoke the courts' decisional and remedial powers." Bd. of Cty. Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(internal quotation marks omitted). Generally, there are three prudential-standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens"; and (iii) "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112 (internal quotation marks and citations omitted).

Traditionally, federal courts framed the zone-of-interests test as an issue of prudential standing. The Supreme Court recently clarified that the zone-of-interests analysis "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l v. Static Control Components, 572 U.S. 118, 127 (2014). Statutory standing "extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." Lexmark Int'l v. Static Control Components, 572 U.S. at 127. Notably, the Supreme Court stated that it "often 'conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt

goes to the plaintiff.'" <u>Lexmark Int'l v. Static Control Components</u>, 527 U.S. at 130 (quoting

<u>Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak</u>, 567 U.S. 209, 225 (2012)).

Moreover, the test "forecloses suit only when a plaintiff's interests are so marginally related to or

inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that

Congress authorized the plaintiff to sue." <u>Lexmark Int'l v. Static Control Components</u>, 527 U.S.

at 130 (internal quotation marks and citations omitted).  This "lenient approach" preserves the

APA's flexible judicial-review provisions.  <u>Lexmark Int'l v. Static Control Components</u>, 527 U.S.

at 130.

## ANALYSIS

The Court first interprets § 15-7-9(C) to conclude that the statute prohibits the disclosure

of litigation-related records that Risk Management maintains, but does not prohibit disclosure of

those record's contents.  Under this definition, the Court concludes that the statute does not prohibit

any behavior in which Madden seeks to engage.  Additionally, that the Second Judicial District

Attorney's Office committed itself to a policy of non-prosecution of § 15-7-9(C) violations -- a

statute which it has never prosecuted -- renders Madden's asserted injury too speculative to grant

Article III standing.  Finally, the Court concludes that, even if Madden has standing to pursue this

matter, the Second Judicial District Attorney's non-prosecution policy renders this case moot.

Accordingly, the Court lacks subject-matter jurisdiction and dismisses the case without prejudice.

**I.  SECTION 15-7-9(C) PROHIBITS THE DISCLOSURE OF LITIGATION-RELATED RECORDS THAT RISK MANAGEMENT MAINTAINS, BUT DOES NOT PROHIBIT DISCLOSURE OF THE RECORDS' CONTENTS.**

To determine § 15-7-9(C)'s constitutionality and Madden's entitlement to her requested

relief, the Court begins with the statute's language.  The statute states:

A.     The following records created or maintained by the risk management division are confidential and shall not be subject to any right of inspection by any person not a state officer, member of the legislature or state employee within the scope of his official duties:

> (1)     records pertaining to insurance coverage; provided any record of a particular coverage shall be available to any public officer, public employee or governmental entity insured under such coverage; and

> (2)     records pertaining to claims for damages or other relief against any governmental entity or public officer or employee; provided such records shall be subject to public inspection by New Mexico citizens one hundred eighty days after the latest of the following dates:

> > (a)     the date all statutes of limitation applicable to the claim have run;

> > (b)     the date all litigation involving the claim and the occurrence giving rise thereto has been brought to final judgment and all appeals and rights to appeal have been exhausted;

> > (c)     the date the claim is fully and finally settled; or

> > (d)     the date the claim has been placed on closed status.

B.     Records protected pursuant to Subsection A of this section shall be made available as necessary for purposes of audit or defense. Any person performing such audit or providing such defense shall keep such records confidential, except as required otherwise by law.

C.     Any person who reveals records protected pursuant to Subsection A of this section to another person in violation of this section is guilty of a misdemeanor and shall, upon conviction, be fined not more than one thousand dollars ($1,000). The state shall not employ any person so convicted for a period of five years after the date of conviction.

N.M. Stat. Ann. § 15-7-9. Madden contends that Risk Management "has taken the position that

Section 15-7-9(C) . . . threatens criminal penalties for any person, including private citizens, who

reveal covered records." Motion ¶ 5, at 4. Madden attaches a statement from counsel for Risk

Management in which the Risk Management attorney asserts his reading of the statute:

> RMD's position is that 15-7-9(C) applies to "Any person who reveals records." This would include Plaintiff, so far as the settlement amount and the release itself, it automatically applies and does not require Plaintiff to "agree" to it, rather, they contend that they are informing Plaintiff of the consequences should she violate State statute.

Motion ¶ 5, at 4 (quoting Email from Douglas E. Gardner to Sean FitzPatrick (dated Aug. 12,

2019), filed September 18, 2019 (Doc. 1-1)). Ortiz asserts that the statute is "a ban on revealing

settlements." Ortiz Response at 2.

Because § 15-7-9 regulates government records' confidentiality, the Court concludes that

IPRA is instructive. IPRA provides that "[e]very person has a right to inspect public records"

unless a specified exception precludes disclosure. N.M. Stat. Ann. § 14-2-1(A). IPRA's purpose

is to promote an informed electorate and transparency in governmental affairs. See N.M. Stat.

Ann. § 14-2-5 ("Recognizing that a representative government is dependent upon an informed

electorate, the intent of the legislature in enacting the Inspection of Public Records Act is to ensure,

and it is declared to be the public policy of this state, that all persons are entitled to the greatest

possible information regarding the affairs of government and the official acts of public officers

and employees"); San Juan Agric. Water Users Ass'n v. KNME-TV, 2011-NMSC-011, ¶ 16, 257

P.3d 884, 888 ("IPRA is intended to ensure that the public servants of New Mexico remain

accountable to the people they serve."). IPRA accordingly establishes a presumption that all

government records are subject to public inspection. See State ex rel. Newsome v. Alarid, 1977-

NMSC-076, ¶ 34, 568 P.2d 1236, 1243 ("The citizen's right to know is the rule and secrecy is the

exception."), superseded on other grounds by statute as stated in Republican Party of N.M. v. N.M.

Taxation & Revenue Dep't, 2012-NMSC-026, ¶¶ 14-16, 283 P.3d 853, 855. IPRA requires each public body of New Mexico to designate a records custodian to receive and respond to records requests. See N.M. Stat. Ann. § 14-2-7. To ensure transparency, IPRA establishes procedure by which "[a]ny person" can inspect public records. N.M. Stat. Ann. § 14-2-1(A). To ensure efficacy, IPRA provides that a "person whose written request has been denied" may bring an enforcement action, and a plaintiff who prevails in an enforcement action can obtain attorneys' fees, costs, and damages. See N.M. Stat. Ann. § 14-2-12.

IPRA excepts from public inspection only eight narrowly drawn categories of records. See N.M. Stat. Ann. § 14-2-6. "IPRA provides for eight exceptions . . . which further refine the definition of 'public record' and highlight the broadness of the basic definition reflecting the general presumption in favor of public access to records." Edenburn v. N.M. Dep't of Health,[4] 2013-NMCA-045, ¶ 17, 299 P.3d 424, 427. Courts of appeal of New Mexico interpret these exceptions narrowly, requiring any exception to be stated expressly. See Edenburn v. N.M. Dep't of Health, 2013-NMCA-045, ¶ 17, 299 P.3d at 427. Further, caselaw reveals a policy of transparency regarding disclosure of settlement records, even those the private entities maintain. See State ex rel. Toomey v. City of Truth or Consequences,[5] 2012-NMCA-104, ¶ 10, 287 P.3d

---

[4]The Court predicts that the Supreme Court of New Mexico would agree with Edenburn v. N.M. Department of Health, that the court interprets narrowly IPRA's exceptions, based on the Court's read of the Supreme Court of New Mexico's opinion in San Juan Agriculture Water Users Association v. KNME-TV, in which the Supreme Court of New Mexico described that IPRA creates a presumption in favor of access, and stated that the right to inspect "must be freely allowed" in the absence of specific statutes or countervailing public policy. 2011-NMSC-011, ¶ 15, 150 N.M. 64, 257 P.3d 884, 888.

[5]The Court predicts that the Supreme Court of New Mexico would agree with State ex rel. Toomey v. City of Truth or Consequences that IPRA embodies a presumption of transparency regarding settlement records, based on the Court's read of the Supreme Court of New Mexico's

364, 371 (concluding that "IPRA's broad language defining public records is clear that, absent an express exemption from disclosure, public agencies must produce all records, even those held by or created by a private entity 'on behalf of' the public agency").

This framework calls into question Ortiz' reading of § 15-7-9(C). Ortiz' reading contradicts general statutory construction rules and IPRA's specific framework. IPRA is about access to public records as a means to inform the electorate and guarantee governmental transparency. See N.M. Stat. Ann. § 14-2-5. Ortiz' reading confuses records with their contents and would allow otherwise public documents to become confidential whenever those records pertain to litigation against the state. The Court analogizes this distinction to the best evidence rule. "The best evidence rule, set forth in Federal Rule of Evidence 1002, holds that 'to prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required . . . .'" United States v. Phillips, 543 F.3d 1197, 1203-04 (10th Cir. 2008)(quoting Fed. R. Evid. 1002). Rule 1002 of the Federal Rules of Evidence applies only when a proponent is trying to prove the contents of a writing. See Fed. R. Evid. 1002. The rule is inapplicable where the proponent does not seek to prove the contents: "The fact that a writing exists that describes or records an event or a condition does not prevent testimony by knowledgeable witnesses about the same event or condition[.]" Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual § 1002.02[1], at 1002-3 (2015). Regarding § 15-7-9(C), that a settlement agreement exists as a record that Risk Management maintains does not prevent a party from discussing that settlement's details, absent an agreement to the contrary in the settlement

_____

opinion in Faber v. King, in which the Supreme Court of New Mexico stated that "we have long held that the public's right to inspect documents is paramount." 2015-NMSC-015, ¶ 28, 348 P.3d 173, 180.

itself. Were it otherwise, the fact of a settlement, even one that lacks confidentiality agreements, would render confidential something about which parties could otherwise speak freely. Using this case as an example, Madden submitted an IPRA request to General Services for records related to opposing counsel in her divorce proceedings. <u>See</u> Complaint ¶ 11, at 3. General Services did not respond to Madden's IPRA request, so she sued, alleging an IPRA violation. <u>See</u> Complaint ¶¶\ 12-13, at 3. As part of Madden's settlement, she received the documents she requested. <u>See</u> Complaint ¶ 14, at 3. Were Ortiz' reading correct, § 15-7-9(C) would bar Madden from discussing the content and existence of documents that were otherwise public under IPRA. <u>See</u> N.M. Stat. Ann. § 14-2-1. Ortiz' reading would allow information contained within otherwise public records to become confidential whenever those records are disclosed pursuant to a settlement agreement. Such a result does not flow from § 15-7-9(C)'s plain language and contradicts IPRA's framework.

This result "would thwart the very purpose of IPRA and mark a significant departure from New Mexico's presumption of openness at the heart of our access law." <u>State ex rel. Toomey v. City of Truth or Consequences</u>, 2012-NMCA-104, ¶ 26, 287 P.3d at 371. Further, Ortiz' reading contradicts rules of statutory construction. Although New Mexico courts interpret broadly IPRA's transparency provisions, all courts interpret criminal statutes narrowly. <u>See</u> <u>United States v. Sterling Islands, Inc.</u>, 391 F. Supp. 3d 1027, 1039 (D.N.M. 2019)(Browning, J.). When interpreting a criminal statute, "'it must be strictly construed, and any ambiguity must be resolved in favor of lenity.'" <u>United States v. Garcia</u>, 939 F. Supp. 2d 1216, 1227 (D.N.M. 2013)(Browning, J.)(quoting <u>Scheidler v. Nat'l Org. for Women, Inc.</u>, 537 U.S. 393, 408 (2003)).

With these principles in mind, the Court considers what § 15-7-9(C) prohibits Madden from doing. Madden entered into a settlement agreement with General Services in August, 2019.

The settlement agreement "pertain[s] to claims for damages or other relief against [a] governmental entity." N.M. Stat. Ann. § 15-7-9(A)(2). Because fewer than 180 days have elapsed since Madden entered into the settlement agreement, or since final judgment was entered in Madden's suit, § 15-7-9(C)'s prohibition is in effect. See N.M. Stat. Ann. § 15-7-9(A)(2). Section 15-7-9(C) prohibits only the settlement agreement's disclosure. Section 15-7-9, accordingly, prohibits Madden from revealing "<u>records</u> pertaining" to her litigation against General Services, but only to the extent that Risk Management "created or maintained" those records. N.M. Stat. Ann. § 15-7-9(A) (emphasis added). As discussed above, the Court concludes that § 15-7-9(C) does not render confidential that which is otherwise subject to public inspection, simply because a record "pertain[s]" to a settlement agreement or litigation. Madden can testify about the records that she received pursuant to the IPRA suit and about the IPRA suit's settlement. The statute, accordingly, does not prohibit Madden from revealing what she learned through her litigation against General Services. Section 15-7-9(C), thus, prohibits the settlement agreement document's disclosure.

## II.   MADDEN DOES NOT HAVE STANDING TO SEEK AN INJUNCTION BARRING SECTION 15-7-9(C)'S ENFORCEMENT.

Although the Defendants do not raise the issue, the Court considers, as it must, whether Madden has standing to pursue this case, and whether this case is moot and, thus, whether the Court has jurisdiction over this case. See Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009)(asserting that courts have "an independent obligation to assure that standing exists, regardless whether it is challenged by the parties."); Koerpel v. Heckler, 797 F.2d 858, 861 (10th Cir. 1986)("Inasmuch as federal courts are courts of limited jurisdiction, the court may and, in fact, has an obligation to inquire into its jurisdiction *sua sponte*."). The Tenth Circuit has stated that

"[e]ach plaintiff must have standing to seek each form of relief in each claim." Bronson v. Swensen, 500 F.3d 1099, 1106 (10th Cir. 2007). "Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 191 (2000) To establish Article III standing, a plaintiff must show that he or she has (i) suffered an injury in fact that is (ii) traceable to the defendants and (iii) redressable by a favorable ruling. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).

Whether a plaintiff pleads an injury-in-fact depends on the plaintiff's cause of action and requested relief. For example, "standing for retrospective relief may be based on past injuries [but] claims for prospective relief require continuing injury." PETA v. Rasmussen, 298 F.3d 1198, 1202 (10th Cir. 2002). Here, Madden alleges a First Amendment violation and requests prospective relief. See Complaint 46, at 8. When a plaintiff alleges a First Amendment violation, "injury in fact can be shown by alleging (1) an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and (2) a credible threat of prosecution." Mink v. Suthers, 482 F.3d 1244, 1253 (10th Cir. 2007). A plaintiff can satisfy the injury-in-fact requirement by showing that he or she faces a credible threat of prosecution for engaging in an activity which the statute proscribes. See Mink v. Suther, 482 F.3d at 1253. The threat must be "actual or imminent, not "conjectural" or "hypothetical."" Lujan v. Defs. of Wildlife, 504 U.S. at 560 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)(quoting Los Angeles v. Lyons, 461 U.S. 92, 102 (1983))). The plaintiff must have an "objectively justified fear of real consequences." D.L.S. v. Utah, 374 F.3d 971, 975 (10th Cir. 2004). Nonetheless, a plaintiff need not risk actual prosecution before challenging a statute's constitutionality. See Seffel v.

Thompson, 415 U.S. 452, 459 (1974); Ward v. Utah, 321 F.3d 1263, 167 (10th Cir. 2003). As the

Supreme Court summarized:

> A plaintiff who challenges a statute must demonstrate a realistic danger of
> sustaining a direct injury as a result of the statute's operation or enforcement. But
> one does not have to await the consummation of threatened injury to obtain
> preventive relief . . . . When the plaintiff has alleged an intention to engage in a
> course of conduct arguably affected with a constitutional interest, but proscribed by
> a statute, and there exists a credible threat of prosecution thereunder, he would not
> be required to await and undergo a criminal prosecution as the sole means of
> seeking relief.

Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)(citations omitted).

Accordingly, a plaintiff challenging a statute's constitutionality must demonstrate an

"objectively justified fear of real consequences." D.L.S. v. Utah, 374 F.3d 971, 975 (10th Cir.

2004). The Tenth Circuit provides that, in this area of the law, "clarity prevails only at the poles,"

and envisions a spectrum along which the plaintiff's asserted threat becomes more credible:

> At the "credible threat" pole lies pre-enforcement claims brought after the entity
> responsible for enforcing the challenged statute actually threatens a particular
> plaintiff with arrest or even prosecution. These claims can be juxtaposed with those
> situated at the "no credible threat" end of the spectrum. There the affirmative
> assurances of non-prosecution from a governmental actor responsible for enforcing
> the challenged statute prevents a "threat" of prosecution from maturing into a
> "credible" one . . . .

Bronson v. Swensen, 500 F.3d 1099, 1108 (10th Cir. 2007). Accordingly, plaintiffs lack standing

to challenge a statute's constitutionality when the relevant district attorney or attorney general

concedes that the statute is unconstitutional and commits to abstain from prosecuting that statute's

violations. See, e.g., Mink v. Suthers, 482 F.3d at 1248 (holding that a plaintiff lacked standing

where the prosecutor concluded that "the statute cannot be constitutionally enforced"); Winsness

v. Yocom, 433 F.3d at 731 (holding that a plaintiff lacked standing to challenge a flag-burning

statute where a district attorney, in response to a plaintiff's lawsuit, signed an affidavit declaring

that he no intention to prosecute because the statute's constitutionality was "doubtful"); <u>D.L.S. v.</u>

<u>Utah</u>, 374 F.3d at 974 (holding that a plaintiff lacked standing to challenge Utah's anti-bigamy

statute where two prosecutors stated in affidavits that they had no intention of prosecuting the

plaintiff and a recent Supreme Court case "snuffed out" any belief that the statute was

constitutional). Even where a plaintiff previously has been arrested under a statute, a district

attorney's commitment not to prosecute may remove the threat of prosecution. <u>See</u> <u>Mink v.</u>

<u>Suthers</u>, 482 F.3d at 1253. Alternatively, standing exists when the entity responsible for enforcing

the challenged statute threatens the plaintiff or warns the plaintiff to refrain from a course of action.

<u>See</u> <u>Steffel v. Thompson</u>, 415 U.S. at 459 (war protester had standing to challenge state trespass

law after law enforcement warned him to stop handbilling and threatened him with arrest); <u>Doctor</u>

<u>John's, Inc. v. City of Roy</u>, 465 F.3d 1150, 1156 (10th Cir. 2006)(adult bookstore owner had

standing to challenge city ordinance when city sent a letter stating that "appropriate legal action

will be commenced" if the bookstore did not comply with the ordinance).

       Here, Madden argues that she wishes to speak about her settlement with General Services

and share its details. <u>See</u> Tr. at 10:18-22 (Stalter, Madden). Madden also asserts a facial challenge

to § 15-7-9(C)'s constitutionality. <u>See</u> Tr. at 22:10-14 (Stalter). Madden resides in New Mexico's

Second Judicial District. <u>See</u> Complaint ¶ 5, at 2. Although the Second Judicial District

Attorney's Office avers that the statute is constitutional, it does not oppose a preliminary

injunction, because it has no plans to prosecute § 15-7-9(C) violations in the Second Judicial

District. <u>See</u> Torrez Response at 1; Tr. at 20:6-12 (Stalter, Pardo). Section 15-7-9(C) prosecutions

must originate with General Services, which maintains the records whose confidentiality

§ 15-7-9(C) protects. <u>See</u> Tr. at 19-17-20 (Stalter, Pardo). If General Services is aware of a

violation, it typically must refer that violation to the relevant district attorney's office, which then may prosecute in its discretion. See Tr. 18:4-19 (Staler, Pardo). The Second Judicial District Attorney's Office asserted that it has never prosecuted § 15-7-9(C) violations. See Tr. at 15:12-14 (Pardo). The Second Judicial District Attorney's Office also asserted that it will not prosecute § 15-7-9(C) violations in the future "until the law is clarified." Tr. at 18:9-10 (Pardo). Pardo explained that Torrez decided not to prosecute § 15-7-9(C) violations "in light of this lawsuit," and because the New Mexico Legislature may amend the statute in the current legislative session.

Madden's claim for prospective relief based upon New Mexico's criminal prohibition against revealing litigation-related records that Risk Management maintains does not rest on a credible threat. Madden has never been charged, prosecuted, or threatened with prosecution under § 15-7-9(C). That the Second Judicial District Attorney's Office has never prosecuted § 15-7-9(C) violations, and avows that it will not prosecute § 15-7-9(C) violations in the future, undercuts Madden's assertion of a credible threat of prosecution. Further, Madden has not pointed the Court to -- and the Court has not found independently -- any § 15-7-9(C) prosecutions outside the Second Judicial District.

Further, Madden does not propose engaging in any behavior that § 15-7-9(C) proscribes. A plaintiff must allege "an intention to engage in a course of conduct arguably . . . proscribed by [the] statute." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. at 298. Madden wishes to "reveal and discuss her case and its outcome with friends, with family, on social media, and if there is interest, with the news media." Complaint ¶ 18, at 7. Madden asserts that § 15-7-9(C) prevents her from "publicizing" her settlement. Motion at 5. Madden said that, if § 15-7-9(C) did not constrain her, she would "try to publish an [article] about the whole thing," and would "share

[her] story, which again [she] believe[s] to be absurd." Tr. at 10:18-22 (Stalter, Madden). Madden asserts that an injunction would enable her to "speak freely about her case." Motion at 6. See Tr. at 10:8-11 (Madden, Stalter).

## II.    **EVEN IF MADDEN HAS STANDING, THE CASE IS MOOT.**

There is some authority for the proposition that a defendant's post-complaint assurances of non-prosecution do not implicate standing, but rather go to a case's mootness. See Nova Health Sys. v. Gandy, 416 F.3d at 1155 ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint.")  Here, when Madden filed the Complaint, a private Risk Management contract attorney advised her that § 15-7-9(C) prohibits her from discussing the amount of her General Services settlement. See Complaint ¶ 23, at 5.  Although the Second Judicial District Attorney's Office asserts that it has never prosecuted § 15-7-9(C) violations, it did not commit to a policy of non-prosecution until the February 5, 2020, hearing.

Whether a case is moot is a more lenient standard than that use to determine whether a plaintiff has standing.  In Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., the Supreme Court elaborated on the differences between the standing and mootness inquiries. See 528 U.S. at 189-92.  The Supreme Court asserted that the Court of Appeals below "confused mootness with standing," which the Supreme Court asserted "is understandable, given this Court's repeated statements that the doctrine of mootness can be described as 'the doctrine of standing set in a time frame: the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'"  528 U.S. at 189 (quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997)).  The Supreme

Court noted, however, that this standard "is not comprehensive," because mootness doctrine is oriented to prevent a defendant's defeating a claim by merely stating that it will cease engaging in wrongful conduct. 528 U.S. at 190. Such a defendant "bears the formidable burden[6] of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." 528 U.S. at 190. While the defendant must demonstrate the case's mootness, the plaintiff must demonstrate standing at a case's outset. See 528 U.S. at 190. The plaintiff must "establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury [is] certainly impending.'" 528 U.S. at 190 (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)). This distinction's upshot is that "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." 528 U.S. at 190. Policy also supports the distinction. The standing requirement conserves judicial resources at the outset by ensuring that courts hear only disputes in which the parties "have a concrete stake." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. at 191. Alternatively, the high mootness bar ensures that courts do not waste judicial resources by abandoning a case at a more advanced stage. See 528 U.S. at 192.

Courts are reluctant to base mootness on a defendant's assurances that it will refrain from the challenged conduct. See United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953). The

---

[6]The Supreme Court presumably meant that the defendant holds the burden of persuasion, rather than the burden of producing evidence, because mootness is jurisdictional. See Moongate Water Co. v. Dona Ana Mut. Domestic Water Consumers Ass'n, 420 F.3d 1082, 1088 (10th Cir. 2005). If there is no longer a live case or controversy, rendering a case moot, the court loses jurisdiction regardless whether the defendant proves it to be so. This reality is why courts have an obligation to examine, sua sponte and throughout the proceedings, whether lack of standing or mootness defeats jurisdiction. See Summers v. Earth Island Inst., 555 U.S. at 499.

Supreme Court has described this standard as "heavy," "stringent," and "formidable" to ensure that defendants cannot use promises to escape accountability. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. at 170. The Tenth Circuit has found mootness where the defendants demonstrate a reasonable certainty that the challenged conduct will not continue. See Tandy v. City of Wichita, 380 F.3d 1277, 1291 (10th Cir. 2004)(concluding that a case was moot, because the defendant demonstrated that it had changed its practices to comply with federal law and "[n]othing in the record suggests that Wichita Transit intends to resume its discontinued practices"). The Tenth Circuit also has found mootness where a defendant foreswears, through official policy channels, any intention of bringing criminal charges under an allegedly constitutional statute. See Winsness v. Yocom, 433 F.3d at 736 (concluding that a case was moot where a district attorney "categorically announce[s] that his office will bring no prosecutions under the statute," even though the plaintiff had been cited for violating the statute, because the prosecutor also "quickly repudiat[ed] the citation").

Here, the Second Judicial District Attorney's Office has committed itself to a policy of non-prosecution. This case also differs from instances in which a defendant evades judicial accountability by empty promises, because the Second Judicial District Attorney's Office has never prosecuted § 15-7-9(C). Although courts are "reluctant to deem a controversy moot based on assurances from the defendants that they will not engage in unlawful activity again," Winsness v. Yocom, 433 F.3d at 736, here the Second Judicial District Attorney's Office has never engaged in the conduct that Madden alleges is unlawful. In Winsness v. Yocom, a plaintiff burned a symbol onto a United State flag and hung the flag on his garage. See 433 F.3d at 729. A sheriff's deputy cited the plaintiff for flag abuse and confiscated the flag as evidence. See 433 F.3d at 729. After

litigating charges against the plaintiff, prosecutors concluded that the statute could not be enforced constitutionally against the plaintiff and "immediately scuttled" the case, and later filed an affidavit with the court assuring that they would not pursue charges. 433 F.3d at 730, 735. The plaintiff also alleged that law enforcement in another county threatened a non-party with prosecution under the same statute. See 433 F.3d at 730. The Tenth Circuit concluded that, even if a credible threat of prosecution existed before the plaintiff sued for injunctive relief, "the prosecutors' affidavits have rendered the controversy moot." 433 F.3d at 736. Despite prosecutors initially litigating charges against the plaintiff for violating the statute, that prosecutor "foreswor[e] any intention to bring criminal charges against individuals who" violate the statute, and his supervisor, the district attorney, "categorically" announced that his office "will bring no prosecutions under the statute." 433 F.3d at 736. The Tenth Circuit held that the "pleadings and affidavits provide no evidence, and the Plaintiffs have provided nothing but speculation, that the prosecutors will change their policies if this lawsuit is dismissed." 433 F.3d at 736.

Here, the Second Judicial District Attorney's Office has never prosecuted § 15-7-9(C) violations, and there is no evidence that it will change its policy and, for the first time, prosecute Madden or anyone else for violating § 15-7-9. The Second Judicial District Attorney's Office never threatened Madden with prosecution, and she does not allege any intent to engage in activity that the statute prohibits. With no threat of prosecution, and no intention to engage in activity that violates the statute, Madden has not alleged a judicially cognizable injury, and, even if there was such an injury at this case's start, this case is now moot. Accordingly, Madden has not satisfied Article III standing requirements.

**IT IS ORDERED** that: (i) the Complaint, filed September 18, 2019 (Doc. 1-1), is dismissed; and (ii) the Court will issue a separate Order dismissing this case without prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth H. Stalter
Stalter Law LLC
Albuquerque, New Mexico

--and--

Sean M. FitzPatrick
FitzPatrick Law, LLC
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*


Lawrence M. Marcus
Alfred A. Park
Park & Associates, LLC
Albuquerque, New Mexico

    *Attorneys for Defendants*